**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

Nichole L.Q.,[1]

                                        Plaintiff,                    5:20-cv-000691 (BKS)

v.

KILOLO KIJAKAZI, Acting Commissioner of Social
Security,[2]

                                        Defendant.

---

**Appearances:**

*For Plaintiff:*
Justin Goldstein
Law Offices of Kenneth Hiller
6000 N. Bailey Avenue, Suite 1A
Amherst, NY 14226

*For Defendant:*
Carla B. Freedman
United States Attorney
Louis J. George
Special Assistant United States Attorney
Social Security Administration
Office of the General Counsel
J.F.K. Federal Building, Room 625
Boston, MA 02203

---

[1] In accordance with the local practice of this Court, Plaintiff's name has been abbreviated to protect her privacy.

[2] Pursuant to Fed. R. Civ. P. 25(d), the current Acting Commissioner of Social Security, Kilolo Kijakazi, has been substituted in place of her predecessor, Commissioner Andrew Saul.

**Hon. Brenda K. Sannes, United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.      INTRODUCTION

Plaintiff Nichole L.Q. filed this action under 42 U.S.C. § 405(g) seeking review of a decision by the Commissioner of Social Security (the "Commissioner") denying Plaintiff's applications for Supplemental Social Security Income ("SSI") and Social Security Disability Insurance ("SSDI") Benefits. (Dkt. No. 1). The parties' briefs, filed in accordance with N.D.N.Y. General Order 18, are presently before the Court. (Dkt. Nos. 13, 16). After carefully reviewing the Administrative Record,[3] (Dkt. No. 10), and considering the parties' arguments, the Court reverses the decision of the Commissioner and remands this matter for further proceedings.

## II.     BACKGROUND

### A.      Procedural History

Plaintiff applied for SSI and SSDI benefits on July 14, 2017, alleging a disability onset date of August 6, 2016, (R. 12), and that she was disabled due to the following impairments: fibromyalgia, post-concussion syndrome, degenerative disc disease, spinal stenosis, light and sound sensitivity, anxiety, hyper mobility, chronic pain, high blood pressure, and right carpal tunnel syndrome. (R. 155). Plaintiff's claims were denied initially on October 10, 2017. (R. 76–80). On October 30, 2017, Plaintiff filed a request for a hearing before an Administrative Law Judge ("ALJ"). (R. 82). ALJ Gretchen Mary Greisler held a hearing on March 20, 2019. (R. 29–59). Plaintiff, her representative, and a vocational expert appeared at the hearing. (R. 29). On May 2, 2019, ALJ Greisler issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act. (R. 12–23). Plaintiff filed a request for review of that

---

[3] The Court cites to the Bates numbering in the Administrative Record, (Dkt. No. 10), as "R." throughout this opinion, rather than to the page numbers assigned by the CM/ECF system.

decision; on April 23, 2020, the Appeals Council denied Plaintiff's request for review. (R. 1–4).

Plaintiff commenced this action on June 22, 2020. (Dkt. No. 1).

### B.    Plaintiff's Background and Testimony

Plaintiff was born in 1977 and was 38 years old at the alleged onset of her disability.

(R. 34). Plaintiff lives in a house with her husband. (R. 35). Plaintiff has two children, one of

whom was eleven years old at the time of the hearing and lives with her. (R. 34–35). Plaintiff

completed two years of college, but did not get a degree. (R. 36). Plaintiff has past work

experience at an insurance company and a payroll company, where she worked in customer

service and technical support. (R. 38). Plaintiff had "a fusion"[4] in 2013, and was able to return to

work afterward, though she still had neck pain. (R. 40). Plaintiff testified that in addition to neck

pain, she suffered a concussion as a result of a garage door accident, has frequent headaches, and

has a condition called Ehlers Danlos syndrome, which "affects connective tissue," "makes

everything really tight and painful," and causes pain in her muscles, which hurt "all the time."

(R. 50–51).

On August 6, 2016, the alleged onset date of disability, Plaintiff was standing outside the

garage door at her residence when her husband, who was "standing on a stool," fixing the garage

door opener, "lost his balance and . . . started falling." (R. 47). Plaintiff "started running towards

him"; as he fell, he "pulled the garage door down." (*Id.*). The garage door "hit [Plaintiff] on the

forehead" and knocked her to the ground. (R. 47–48). Plaintiff lost consciousness for "a few

seconds." (R. 48). Two days later, Plaintiff went to the doctor, who referred her for a CT scan,

which did not "show . . . anything." (*Id.*). Plaintiff was referred "to the concussion clinic," where

---

[4] The record reflects Plaintiff had a cervical fusion in 2013. (R. 741).

a concussion was diagnosed. (R. 48–49). Plaintiff, who was working at the time, did not return to work after the accident. (R. 41).

Since the concussion, Plaintiff has been unable to "walk straight" and "walk[s] into walls a lot." (R. 46). Plaintiff is also unable to sit or stand in one place for "very long before [she] start[s] having too much pain." (*Id.*). Plaintiff has experienced headaches for "years" but they are "much worse" since the garage door accident. (R. 44). Since the accident, Plaintiff has had headaches every day—but once every "three to four months," she gets a headache that is "so bad" that she cannot function. (R. 44–45). During these headaches, Plaintiff has difficulty with memory, including word recall, and she can be in the middle of a conversation and be unable to remember "what we were talking about." (R. 46). These headaches can last seven to ten days. (R. 45). To treat these headaches, Plaintiff wears a neck brace, stays in a dark room, takes "all kinds of medications," and goes to the physical therapist and doctor "trying to relieve it." (*Id.*).

For neck pain, Plaintiff goes to physical therapy weekly and receives injections and radiofrequency to "burn[] [her] nerves." (R. 41). Plaintiff stated that the radiofrequency is "not working anymore." (*Id.*). Plaintiff is on the following medications: Gabapentin, Cymbalta, Zovia, Xanax, Oxybutynin Chloride, Propranolol, Amitriptyline, Kelnor, Lisinopril, Tizanidine, Topamax, and Tramadol. (R. 42–43). The Tramadol and Gabapentin make her drowsy and the Topamax makes her "feel kind of loopy" and "very confused," especially when driving. (R. 43).

Plaintiff stated that she cannot return to her prior work because she cannot sit, type, or do work on the computer "for long periods of time." (R. 40). Plaintiff explained that she cannot sit for long before needing to change positions due to neck pain. (*Id.*). Plaintiff's Ehlers Danlos syndrome, which, as stated, affects connective tissue, makes typing for long periods of time difficult because it "pulls everything." (R. 50–51).

Plaintiff testified that she has good days and bad days and that "some days" she feels good when she wakes up but if she "do[es] stuff in the morning," it "could put [her] down" in the afternoon. (R. 51). Plaintiff spends approximately one hour each week helping her husband in his construction business with paperwork and phone calls. (R. 39). Plaintiff testified that she is able to reach overhead, but "it does cause pain" because she "had the fusion." (R. 49). Plaintiff is able to lift a laundry basket containing dry clothes. (R. 50). Plaintiff "can sweep a room" but she "might pay for it" later that day or the next day. (R. 51). Plaintiff attends her daughter's school concerts, though it is "painful" "sitting there." (*Id.*). Plaintiff is able to drive to doctors' appointments but gets confused and has a hard time with directions. (R. 35–36). Plaintiff "got lost" driving to the hearing. (R. 36). Plaintiff is able to read, write, and "make change at the store." (R. 37).

At the hearing, the ALJ outlined several exertional, environmental, and mental restrictions and requirements to the vocational expert, including, as relevant here, "a brief one to two minute change of position after sitting, standing or walking for one hour, but retains the ability to remain on task," the restriction to simple, routine, and repetitive work, with few changes and simple interaction with others, and an ability to reach overhead rarely and intermittently. (R. 54). The vocational expert testified that a hypothetical individual with those restrictions could not return to Plaintiff's past work but could perform the sedentary work of a document preparer or ampoule sealer. (R. 54–55). The vocational expert testified, however, that if an individual were off-task fifteen percent or more of the workday or absent more than one day each month, it would preclude Plaintiff's past relevant work as well as work as a document preparer or ampoule sealer. (R. 55–56).

C.       **Medical Opinion Evidence**

1.       **Eric Canavan, P.T.**

In a "Medical Source Statement" dated February 2, 2019, Physical Therapist Eric Canavan,[5] identified Plaintiff's diagnosis as Ehlers Danlos Syndrome, and stated that Plaintiff's prognosis was "degenerative without maintenance." (R. 768). PT Canavan indicated that Plaintiff was "incapable" of tolerating "even 'low stress' jobs" because she has "multiple joint dislocations [and] subluxations even with static activities." (*Id.*). PT Canavan opined that Plaintiff can walk one block "without rest or severe pain," can sit or stand for ten minutes "at one time" before moving but could sit, stand, or walk "less than 2 hours" "total in an 8-hour workday." (*Id.*). Plaintiff needed "a job that permits shifting positions at will from sitting, standing or walking." (*Id.*). Plaintiff would "need to take unscheduled breaks during an 8-hour working day" "every hour" for an "unknown" length of time "before returning to work." (R. 769). Plaintiff's legs should be elevated "[w]ith prolonged sitting." (*Id.*). Plaintiff can lift and carry less than ten pounds "frequently," ten pounds "rarely," but can "never" lift or carry more than twenty pounds. (*Id.*). Plaintiff can "rarely" look down, turn head, look up, hold head in static position, twist, stoop or bend, crouch or squat, or climb stairs, occasionally use her hands to manipulate objects, and never climb ladders or reach with her arms. (R. 769–70). PT Canavan opined that Plaintiff's condition was "likely to produce 'good days' and 'bad days'" and that during a "typical workday," Plaintiff's "experience of pain or other symptoms" was "severe enough to interfere [frequently] with attention and concentration needed to perform even simple

---

[5] PT Canavan began working with Plaintiff following the December 7, 2017, Ehlers Danlos Syndrome diagnosis by Dr. David Kanter and Dr. Carlos Marrero-Prats at Upstate Physical Medicine and Rehabilitation. (R. 906–20). Following the diagnosis, Dr. Marrero-Prats noted that the "best course of action is to send her to a PT that has vast knowledge of EDS treatment," (R. 915), and Dr. Kanter specifically referred Plaintiff to PT Canavan, (R. 916). The medical records reflect Plaintiff saw PT Canavan from December 12, 2017 through December 14, 2018. (R. 640–722).

work tasks." (R. 770). PT Canavan estimated that Plaintiff was "likely to be absent from work" "[m]ore than four days per month" "as a result of the impairments or treatment." (*Id.*).

### 2. Elke Lorensen, M.D.

On September 25, 2017, Dr. Lorensen conducted an internal medicine examination. (R. 431). Dr. Lorensen listed Plaintiff's "chief complaint[s]" as "a concussion," "fibromyalgia, back pain, and carpal tunnel syndrome." (*Id.*). Plaintiff also reported neck pain, cervical spine surgery, degenerative disc disease, and that she "has had fibromyalgia for 16 years" and that it causes joint and muscle pain, as well as "worsening of her headaches." (*Id.*).

As to her activities of daily living, Plaintiff reported that she "cooks three times a week, cleans, does laundry once a week, shops twice a week, does childcare daily, showers and dresses daily, watches TV, and goes out to dinner and socializes." (R. 432).

On physical examination, Dr. Lorensen found Plaintiff was "[a]ble to rise from chair without difficulty," "[n]eeded no help changing for exam or getting on and off exam table, had a normal gait and stance, but lost "balance when walking on toes," and could "[s]quat 40%." (*Id.*). Plaintiff's cervical spine showed flexion, extension, and lateral flexion "30 degrees," 40 degrees rotation on the right, and 60 degrees rotation on the left. (R. 433). Plaintiff's lumbar spine showed flexion to 70 degrees, 15 degrees extension, and 20 degrees lateral flexion. (*Id.*). Straight leg raise was negative. (*Id.*). Plaintiff had full range of motion in her lower extremities and showed no evidence of subluxations. (*Id.*). Plaintiff's joints were "stable and nontender." (*Id.*). Dr. Lorensen identified "[t]en positive trigger points." (*Id.*). Plaintiff's strength was "5/5 in the upper and lower extremities." (*Id.*). In her medical source statement, Dr. Lorensen wrote that Plaintiff had "[n]o gross limitations sitting, standing, walking, and handling small objects with the hands" and "[m]oderate limitations for bending, lifting, reaching, and turning of the head." (R. 434).

### 3.    Jeanne A. Shapiro, Ph.D.

On September 29, 2017, Dr. Shapiro conducted a consultative psychiatric examination. (R. 438). Dr. Shapiro noted that Plaintiff drove herself "approximately 10 miles" "to the examination." (*Id.*). Plaintiff reported that she was able to care for herself independently, but that she "is not always able to cook and prepare food, do general cleaning, laundry, or shopping due to medical problems"; Plaintiff reported that she can "manage money and drive to appointments and to the store." (R. 441). Plaintiff "spends her days trying to take care of things around the house and resting, going to the store and to appointments." (*Id.*). Plaintiff stated that she "gets along well with friends and her parents." (*Id.*). Plaintiff told Dr. Shapiro that "she is unable to work at the present time because of medical problems." (R. 438). Plaintiff reported that she "is currently not in treatment" and that her primary care provider "prescribes her current psychiatric medication." (*Id.*). Dr. Shapiro listed Plaintiff's medical conditions as fibromyalgia, hypermobility, chronic fatigue, spinal stenosis, degenerative disc disease, and "hx concussion." (R. 439).

Plaintiff told Dr. Shapiro that "she has difficulty falling asleep and usually wakes up 2–3 times nightly." (R. 439). Plaintiff did "not report any significant depressive or manic related symptoms, or symptoms of a formal thought disorder." (*Id.*). Plaintiff stated that "she feels anxious all of the time regarding her medical problems" and "feels anxious being around a lot of people and where there is a lot of noise and chaos." (*Id.*). Plaintiff "gets anxious about finances" and "feels lost and nervous when she drives." (*Id.*). Plaintiff reported that "she is light and sound sensitive due to the concussion." (*Id.*).

Dr. Shapiro conducted a mental status examination and found Plaintiff's appearance, speech, thought processes, affect, mood, and sensorium to be largely normal, her attention and concentration and recent and remote memory skills to be intact, her cognitive functioning to be

in in the "low average range," and her general fund of information to be "appropriate to experience." (R. 440).

In her medical source statement, Dr. Shapiro opined, as relevant here, that Plaintiff had "no limitations in understanding, remembering, or applying simple directions and instructions," or in "using reasoning and judgment to make work related decisions." (R. 441). Dr. Shapiro stated that Plaintiff had "mild limitations understanding, remembering, or applying complex directions and instructions." (*Id.*). Dr. Shapiro found Plaintiff "to have moderate limitations sustaining concentration and performing a task at a consistent pace," and "regulating emotions, controlling behavior, and maintaining well-being." (*Id.*). Dr. Shapiro opined that Plaintiff had "mild-moderate limitations sustaining an ordinary routine and attendance at work." (*Id.*).

### D.     The ALJ's Decision Denying Benefits

On May 2, 2019, ALJ Greisler issued a decision finding that Plaintiff was not disabled under the Social Security Act. (R. 12–28). The ALJ first found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2021, (R. 14), then proceeded with the required five-step evaluation process to reach her conclusion.[6]

At step one, the ALJ determined that Plaintiff had not engaged in any substantial gainful activity since her alleged onset date of August 6, 2016. (*Id.*). At step two, the ALJ determined

---

[6] Under the five-step analysis for evaluating disability claims:

> [I]f the Commissioner determines (1) that the claimant is not working, (2) that [she] has a severe impairment, (3) that the impairment is not one listed in Appendix 1 of the regulations that conclusively requires a determination of disability, and (4) that the claimant is not capable of continuing in [her] prior type of work, the Commissioner must find [her] disabled if (5) there is not another type of work the claimant can do.

*Burgess v. Astrue*, 537 F.3d 117, 120 (2d Cir. 2008) (quoting *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003)) (internal quotation marks and punctuation omitted). "The claimant bears the burden of proving his or her case at steps one through four," while the Commissioner bears the burden at the final step. *Butts v. Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004).

that Plaintiff had the following severe impairments under 20 C.F.R. §§ 404.1520(c), 416.920(c): "anxiety, post-concussion syndrome/mild traumatic brain injury, a spine disorder (status post cervical spine fusion), obesity, right carpal tunnel syndrome, fibromyalgia and Ehlers-Danlos (hypermobility) syndrome." (*Id.*). At step three, the ALJ found that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." (R.15 (citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526)).[7]

The ALJ next considered Plaintiff's residual functional capacity ("RFC")[8] and found that she had the RFC "to perform sedentary work as defined in 20 CFR 404.1567(a)," except that Plaintiff "requires a brief 1–2 minute change in position after sitting, standing or walking for 1 hour, but retains the ability to remain on task." (R. 17). In addition, the ALJ found Plaintiff could perform "simple, routine and repetitive tasks in a work environment free of fast paced production requirements, involving only simple, work-related decisions and few, if any, workplace changes" and could "tolerate occasional simple interaction with supervisors, coworkers and the public." (*Id.*). In making this determination, the ALJ evaluated Plaintiff's subjective complaints of disabling limitations using a two-step process. (R. 18). First, the ALJ considered "whether there is an underlying medically determinable physical or mental impairment(s) . . . that could reasonably be expected to produce the claimant's pain or other symptoms." (*Id.*). Second, the ALJ evaluated "the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's work-related activities." (*Id.*). Applying this two-step process, the ALJ found that while Plaintiff's "medically determinable impairments

---

[7] Plaintiff does not challenge the ALJ's findings through step three.

[8] The regulations define residual functional capacity as "the most [a claimant] can still do despite" her limitations. 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

could reasonably be expected to cause the alleged symptoms," her "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (*Id.*).

The ALJ also considered the persuasiveness of the four opinions in the record in determining Plaintiff's RFC. The ALJ found the opinion of PT Canavan, Plaintiff's physical therapist, was "not persuasive," explaining that as a physical therapist, PT Canavan "is not an acceptable medical source," that PT Canavan's opinions regarding Plaintiff's exertional limitations were "extreme and if taken literally, would suggest that the claimant requires assistance with all phases of her daily life." (R. 20). The ALJ further found PT Canavan's opinion on psychological issues were "beyond his area of expertise." (*Id.*).

The ALJ found the opinion of Dr. Lorensen, a consultative examiner who opined that Plaintiff had "no limitations" for sitting, standing, or walking and "moderate limitations" for, among other things, bending, lifting, and reaching, was "not persuasive" because the "totality of the medical evidence of record justifies greater limitation on the claimant's physical functioning." (R. 21). For the same reason, the ALJ found the opinion of the reviewing state agency physician to be "not persuasive." (*Id.*).

The ALJ found Dr. Shapiro's opinion regarding Plaintiff's mild-to-moderate mental limitations to be "persuasive as they are consistent with and supported by Dr. Shapiro's own mental status examination, the lack of mental health treatment by the claimant and the reports from her care providers." (*Id.*).

At step four, the ALJ determined that Plaintiff was "unable to perform past relevant work." (*Id.*). At step five, relying on the testimony of the vocational expert, the ALJ found that, "[c]onsidering the claimant's age, education, work experience, and residual functional capacity,

11

there are jobs that exist in significant numbers in the national economy that the claimant can perform." (R. 22). These jobs include document preparer, addresser, and ampule sealer. (*Id.*). Accordingly, the ALJ found Plaintiff "not disabled." (*Id.*).

## III.   STANDARD OF REVIEW

In reviewing a final decision by the Commissioner under 42 U.S.C. § 405, the Court does not determine de novo whether Plaintiff is disabled. Rather, the Court must review the administrative record to determine whether "there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009). "Substantial evidence is 'more than a mere scintilla.' It means such *relevant* evidence as a *reasonable* mind might accept as adequate to support a conclusion." *Brault v. Social Sec. Admin., Comm'r*, 683 F.3d 443, 447–48 (2d Cir. 2012) (per curiam) (quoting *Moran*, 569 F.3d at 112). The substantial evidence standard is "very deferential," and the Court may reject the facts that the ALJ found "only if a reasonable factfinder would *have to conclude otherwise*." *Id.* at 448 (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)). The Court, however, must also determine whether the ALJ applied the correct legal standard. *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999). "'Where an error of law has been made that might have affected the disposition of the case, this court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ.'" *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984) (quoting *Wiggins v. Schweiker*, 679 F.2d 1387, 1389 n.3 (11th Cir. 1982)). The Court reviews de novo whether the correct legal principles were applied and whether the legal conclusions made by the ALJ were based on those principles. *See id.*; *see also Johnson v. Bowen,* 817 F.2d 983, 985 (2d Cir. 1987).

**IV.      DISCUSSION**

Plaintiff argues that the Commissioner's decision denying disability benefits must be reversed because: (1) the ALJ's rejection of Plaintiff's subjective symptoms is not supported by substantial evidence, (Dkt. No. 13, at 12–17); and (2) the ALJ's RFC finding is not supported by substantial evidence, (*id.* at 17–25). The Commissioner responds that the ALJ did not err in evaluating Plaintiff's subjective symptoms and that the ALJ's RFC determination is supported by substantial evidence. (*See generally* Dkt. No. 16).

**A.      Evaluation of Subjective Complaints**

Plaintiff argues that the ALJ erred in evaluating (and rejecting) her subjective complaints of disabling physical and mental impairments by: (1) mischaracterizing the record evidence of the diagnosis of fibromyalgia; (2) rejecting Plaintiff's complaints of medication side effects as undocumented despite medical records noting her complaints of drowsiness; (3) faulting Plaintiff for complying with medical treatment and essentially rendering an "expert medical opinion" regarding Plaintiff's memory and focus, "which is beyond [the ALJ's] competence"; and (4) failing to account for the impact Plaintiff's disabling headaches would have on her ability to attend work regularly. (Dkt. No. 13, at 12–17).[9] The Commissioner responds that any error with respect to the ALJ's consideration of fibromyalgia or medication side effects was not "prejudicial," that Plaintiff's arguments regarding the ALJ's reading of the medical evidence are "an invitation for the Court to reweigh the evidence, which is not a proper inquiry," and that "substantial evidence supports the ALJ's subjective symptom evaluation." (Dkt. No. 16, at 8–19).

---

[9] As remand is required based on errors with respect to several of the above issues, the Court does not reach the additional arguments Plaintiff advances in her brief regarding the ALJ's evaluation of her subjective symptoms.

The governing regulations provide a two-step process for evaluating a claimant's testimony about subjective complaints of pain and other limitations. 20 C.F.R. § 404.1529. First, the ALJ must determine if the claimant has medically determinable impairments that could produce the alleged symptoms; and second, if the impairments do exist, the ALJ must evaluate the intensity, persistence, and limiting effects of the symptoms to determine the extent to which the symptoms limit the claimant's ability to work. *See Pidkaminy v. Astrue*, 919 F. Supp. 2d 237, 249 (N.D.N.Y. 2013) (citing 20 C.F.R. § 404.1529(a)). In so doing, the ALJ considers the following:

1)  the claimant's daily activities;

2)  the location, duration, frequency, and intensity of the claimant's pain or other symptoms;

3)  precipitating and aggravating factors;

4)  type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to relieve his pain or other symptoms;

5)  other treatment the claimant receives or has received to relieve his pain or other symptoms; any measures the claimant takes or has taken to relieve his pain or other symptoms; and

6)  any other factors concerning the claimant's functional limitations and restrictions due to his pain or other symptoms.

*Id.* (citing 20 C.F.R. § 416.929(c)(3)(i)-(vii)). "After considering the objective medical evidence, the claimant's demeanor and activities, subjective complaints, as well as any inconsistencies between the medical evidence and the claimant's subjective complaints, an ALJ may accept or disregard the claimant's subjective testimony as to the degree of impairment." *Id*. "An ALJ who rejects the subjective testimony of a claimant must do so explicitly and with sufficient specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief and whether his decision is supported by substantial evidence." *Id.* (internal quotations and citation

omitted). In general, courts "afford great deference to the ALJ's credibility finding, since the ALJ had the opportunity to observe [the claimant's] demeanor while [the claimant was] testifying." *Kessler v. Colvin*, 48 F. Supp. 3d 578, 595 (S.D.N.Y. 2014) (citation omitted).

### 1.    Fibromyalgia

Plaintiff argues that the ALJ "made mischaracterizations of the record regarding fibromyalgia." (Dkt. No. 13, at 12–13). The Commissioner responds that any error was not "prejudicial." (Dkt. No. 16, at 9–10).

In discussing whether the medical evidence was consistent with Plaintiff's subjective symptoms, the ALJ specifically considered the "diagnosis of fibromyalgia [that] appears in the record." (R. 19). The ALJ found that "the fibromyalgia diagnosis is simply repeated by care providers without further discussion or examination findings," noting that that Plaintiff "has not been referred to a rheumatologist" and "no treating care provider documents 11/18 trigger points" or "has verified that the claimant meets the diagnostic criteria for fibromyalgia." (*Id.*). These findings, however, are factually inaccurate. As Plaintiff points out, the record shows that she has been referred to a rheumatologist—Jianghon Yu, M.D., who saw her on December 19, 2016—and that Dr. Yu found 18/18 positive fibromyalgia tender points and observed that Plaintiff's "clinical presentation indicates fibromyalgia given the concurrent unrestorative sleep and depression as well as diffuse tender trigger points." (R. 311–12). The Commissioner acknowledges that the ALJ's statement that Plaintiff has not been referred to a rheumatologist is incorrect, (Dkt. No. 16, at 10), but argues that because Plaintiff had only a single visit with Dr. Yu and "there does not appear to have been any treatment relationship," the ALJ "correctly stated that no *treating* source verified that plaintiff met the diagnostic criteria for fibromyalgia." (*Id.* at 9–10). However, the ALJ's statement is only incidentally correct—because the ALJ's decision neither references Dr. Yu nor cites the medical records from Plaintiff's appointment

with Dr. Yu, the Court concludes that the ALJ did not consider this evidence and that her findings are factually inaccurate. *See Paries v. Colvin*, No. 11-cv-0478, 2013 WL 4678352, at *9, 2013 U.S. Dist. LEXIS 124160, at *29 (N.D.N.Y. Aug. 30, 2013) ("An ALJ's credibility analysis is not supported by substantial evidence when the analysis is based on inaccurate or inconsistent evidence." (citing *Genier v. Astrue*, 606 F.3d 46, 50 (2d Cir. 2010))).

**2.** **Medication Side Effects**

Plaintiff argues that the ALJ's rejection of Plaintiff's complaints of disabling medication side effects on the ground that such complaints are not documented in the record was erroneous. (Dkt. No. 13, at 13). The Commissioner responds that the ALJ properly evaluated medication side effects and Plaintiff has not "demonstrated prejudicial error." (Dkt. No. 16, at 11–12).

The ALJ found that though Plaintiff "testified that her medications cause drowsiness, she has not reported this to her care providers, and no care provider appears to have restricted her activities, such as driving a car, based on her reports." (R. 20). Plaintiff argues that this is a mischaracterization of the record because medical records show she reported side effects of drowsiness to her physicians. (Dkt. No. 13, at 13). The Court finds no error. At the hearing, Plaintiff testified that she experienced side effects from Tramadol, Gabapentin, and Topamax. (R. 43). Although Plaintiff identifies notations in medical records regarding side effects from *other* medications, (*see* Dkt. No. 13, at 13 (citing inter alia R. 255 ("Flexeril causes sleepiness."), 540 ("Provider recc d/c Elavil due to fatigue."), 893 ("[U]nable to tolerate the 1mg of Xanax due to it being overly sedating.")), she has not cited any record noting side effects from Tramadol, Gabapentin, or Topamax, about which she testified. Even if the ALJ erroneously overlooked the side effects of Flexeril, Elavil, and Xanax, any error was harmless since none of the records Plaintiff cites undermines the ALJ's finding regarding the impact of drowsiness, (*see* R. 20

16

(finding that "no care provider appears to have restricted [Plaintiff's] activities, such as driving a car, based on her reports of sleepiness")).

### 3.    Cognitive Abilities – Memory and Focus

Plaintiff argues that the ALJ improperly used her compliance with medical treatment against her in concluding that Plaintiff's complaints about her cognitive abilities, namely her difficulties with memory and focus, were "not entirely consistent with the medical evidence and other evidence in the record." (Dkt. No. 13, at 13–14; R. 18–19). [10] Plaintiff argues that "the factual record documents the frequency of . . . symptoms and documents memory, concentration, and focus problems." (Dkt. No. 13, at 14). The Commissioner responds that the ALJ appropriately relied on Plaintiff's ability to attend appointments and did not impose "her lay observation of Plaintiff" in rejecting Plaintiff's subjective symptoms and that Plaintiff's "citation to medical records" is an improper request for a reweighing of the evidence. (Dkt. No. 16, at 14–17).

In finding Plaintiff's testimony of continuing cognitive difficulties, including "memory and word finding issues," was not consistent with the record, the ALJ explained that Plaintiff was able to focus during medical appointments and recount her medical history, articulate her needs, and "participate in medical decision making without observed difficulty." (R. 19). However, the ALJ cites no record where a medical provider observed and noted Plaintiff's focus during the appointment or commented on her ability to "describe her situation" and "wants and needs" or to take part in medical decisions. Thus, it appears the ALJ impermissibly "substitute[d]

---

[10] Plaintiff also objects to the ALJ's finding that she "missed few, if any [physical therapy] sessions over a 10 month period and did all exercises," which the ALJ relied on in finding PT Canavan's opinion that Plaintiff would be absent more than four days each month on the same ground—that the ALJ used her compliance with medical treatment against her. (Dkt. No. 13, at 13–14; R. 20). As the Court is remanding this matter and directing the Commissioner to re-evaluate, inter alia, the opinion evidence, the Court does not reach this issue.

[her] own expertise or view of the medical proof." *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000). Further, the amount of focus necessary for a single medical appointment is incommensurate with the amount of focus required for an eight-hour workday. *See Susan B. v. Comm'r of Soc. Sec.*, 515 F. Supp. 3d 225, 240 (D. Vt. 2021) (explaining that "Plaintiff's ability to concentrate during a brief medical appointment does not negate the conclusion that she could not concentrate for a prolonged period of time during an eight-hour work day" and that "the ALJ 'substitute[d] his own expertise or view of the medical proof'" in rejecting physician's opinion that the plaintiff's difficulty concentrating, among other things, caused job related restrictions (quoting *Shaw*, 221 F.3d at 134)).

Even assuming this error was harmless, Plaintiff argues that in addition to the ALJ substituting her own view of the record, the ALJ improperly rejected "favorable and undisputed evidence" showing Plaintiff's cognitive difficulties in the areas of memory and focus. (Dkt. No. 13, at 16). In considering Plaintiff's mental functioning and memory and focus, the ALJ acknowledged that Plaintiff "testified that she continues to have memory and word finding issues" and that Dr. Shapiro noted that Plaintiff "presented as tense and apprehensive" at the consultative examination, (R. 19 (citing R. 440)), but observed that Plaintiff has otherwise been described by providers as "cooperative, appropriate and happy" and in no acute distress, (*id.* (citing inter alia R. 510, 515, 521)), and that the medical records show that Plaintiff's memory "has consistently found to be intact without observations of language issues." (R. 19 (citing inter alia R. 393, 414, 426 (records from CNY Spine and Pain Medicine, LLC dated February 14, 2017 to August 1, 2017, which indicate that "Patient displays normal short/long term memory"), 438 (consultative psychiatric evaluation noting Plaintiff's "attention and concentration was intact" and "recent and remote memory skills were intact"), 510 (primary care provider noting

that Plaintiff's "[m]emory is intact" and memory was within normal limits), 742 (pain medicine

physician noting that "Patient displays normal short/long term memory")). However, in reaching

this conclusion, the ALJ only acknowledged Plaintiff's testimony regarding her "memory and

word finding issues" and, as Plaintiff notes, made no reference to the "favorable" medical

evidence and testing that reflects Plaintiff's memory and focus difficulties. (*See* Dkt. No. 13, at

16 (citing R. 255 (Dr. Claudine Ward of Upstate Physical Medicine and Rehabilitation noting

that Plaintiff "describes decreased ability to concentrate, short-term memory deficits"), 259

(Nurse Practitioner Paul Trela noting that Plaintiff "struggles with memory issues, primarily with

word searching" and "has difficulty concentrating"), 262 (same), 268–72 (occupational therapist

noting "short term memory problems, word finding" and setting memory goals including

recalling a "conversation at 75 percent accuracy for detail"), 299–304 (same), 316 (occupational

therapist noting that Plaintiff "did well with approximately 75% retention of information,

completed categorization/word find . . . using planners to assist with memory tasks"), 324–25

(occupational therapist noting that on "cognitive screen" Plaintiff performed "below normal" on

[d]igits forward" and "[d]igits back" and had some delays in recall), 327 (notation by Brian

Rieger, Ph.D., at the Upstate concussion program, that "[h]eadaches are quite significant, and she

continues to have limited mental . . . stamina"), 886 (Plaintiff reporting to Dr. Bethany Calabrese

that her "memory has worsened" and that "it has become more difficult to focus"), 899 (Nurse

Practitioner Alicia Kell noting on neurological exam, "[a]t times short term memory impairment

post concussion in 2016"), 891 ("Montreal Cognitive Assessment" showing "deficits in language

repetition, fluency, delayed recall"), and 941 (Dr. Jared Wilson noting that Plaintiff was "still

having memory and word finding" problems)).

Indeed, the ALJ does not appear to have cited or attempted to reconcile any of this evidence. While an ALJ "does not have to state on the record every reason justifying a decision" or "discuss every piece of evidence submitted," *Brault*, 683 F.3d at 448, and ALJ may not "simply pick and choose from the transcript only such evidence that supports [her] determination, without affording consideration to evidence supporting the plaintiff's claims. It is grounds for remand for the ALJ to ignore parts of the record that are probative of the claimant's disability claim." *See Sutherland v. Barnhart*, 322 F. Supp. 2d 282, 289 (E.D.N.Y. 2004) (citing *Lopez v. Sec'y of Dep't of Health & Human Servs.*, 728 F.2d 148, 150–51 (2d Cir. 1984)). Given the ALJ's substitution of her own view of the evidence and failure to acknowledge, even briefly, the medical records suggesting cognitive difficulties, the Court cannot say the ALJ's conclusion that Plaintiff's subjective complaints of impaired mental functioning is supported by substantial evidence.

### 4. Headaches

Plaintiff also argues that the ALJ erroneously rejected Plaintiff's testimony regarding the severity and frequency of her headaches, which, Plaintiff argues, would prohibit her from maintaining regular work attendance. (*See, e.g.*, Dkt. No. 13, at 15–16 (arguing that the record shows that Plaintiff "had constant and/or daily headaches and/or neck pain ranging in severity" and that "the severity of pain and headaches far exceeds the tolerance indicated for absences indicated by the vocational expert").[11] The Commissioner responds that the ALJ properly

---

[11] Plaintiff also argues that the ALJ erroneously rejected her complaints of neck pain and that the frequency of her medical appointments would preclude regular work attendance. (Dkt. No. 13, at 15–16). Unlike Plaintiff's headaches, the ALJ discussed Plaintiff's neck pain as well as corresponding medical records and clinical findings; thus, the Court finds no fundamental error with respect to the ALJ's consideration of Plaintiff's complaints of neck pain. However, because remand is required based on other errors in the ALJ's analysis of Plaintiff's subjective complaints, and because the Commissioner will need to undertake further analysis of Plaintiff's subjective complaints as a whole, the Court has not considered whether the ALJ's rejection of Plaintiff's complaints of disabling neck pain was supported by substantial evidence.

considered the evidence and that Plaintiff's citation of medical records documenting the frequency and intensity of her headaches, is an "invitation for the Court to reweigh the evidence, which is not a proper inquiry." (Dkt. No. 16, at 14). The Court, however, cannot evaluate whether the ALJ properly rejected Plaintiff's testimony of disabling headaches because, aside from a reference to a "history of headaches, more pronounced since August 2016," (R. 18), the decision contains no discussion whatsoever of Plaintiff's headaches, the corresponding medical records, or clinical findings. An ALJ who "rejects the subjective testimony of a claimant must do so explicitly and with sufficient specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief and whether his decision is supported by substantial evidence." *Pidkaminy*, 919 F. Supp. 2d at 249. Thus, it was legal error to reject Plaintiff's headache complaints without further discussion.

Further, given the evidence in the record regarding Plaintiff's headaches after the alleged onset date of her disability, which coincides with the garage-door accident, the Court cannot find the ALJ's rejection of Plaintiff's subjective complaints of headaches supported by substantial evidence. For example, when Nurse Practitioner Paul Trela at the Concussion Management Program saw Plaintiff on November 7, 2016, Plaintiff reported a "constant headache that is frontal in nature" and "occasional headaches that are located in the right occipital region." (R. 259). On December 18, 2016 Physician Assistant Sarah Castilano, Plaintiff's primary care provider, noted that Plaintiff "reports dizziness and frequent or severe headaches." (R. 240). On January 27, 2017, Dr. Claudine Ward, whom Plaintiff saw for headaches at Upstate Physical Medicine and Rehabilitation, noted that:

> Since her injury, the patient has been experiencing somatic symptoms including . . . posttraumatic headaches, changes in balance, fatigue, and sensitivity to light. Her headaches are usually located in the frontal region but can occur in the occipital region.

> They fluctuate in intensity, from 2–10/10 throughout the day. Cognitive exertion, physical exertion, working on computers and reading can increase headache intensity. They become more throbbing in quality and are associated with nausea and photo-and phonophobia 1–2 times per week. These severe headaches last hours and are debilitating.

(R. 255). On examination, Dr. Ward found Plaintiff's "[o]ccipital nerves are tender to palpation bilaterally" and diagnosed post-concussion syndrome with persistent cognitive deficits and fatigue, sleep disturbance, headache, affective disturbance, and apathy lasting at least three months. (R. 257–58). On September 8, 2017, Plaintiff saw Dr. Bethany Calabrese for follow-up for post-concussive syndrome and reported headaches "3–4 times per week," that "may last up to 4 days." (R. 885). On January 9, 2018, Plaintiff saw Dr. Diya Goorah regarding headaches and reported that she "continues to get headaches a few times a week instead of daily as they were previously," and that they "last a couple hours" and are "6/10 on average." (R. 892). On October 10, 2018, Plaintiff saw neurologist Dr. Hassan Shakri regarding headaches. (R. 731). Plaintiff reported "chronic daily headache," the majority of which "is concentrated in her forehead." (R. 731). Dr. Shakri noted "[t]his is a patient with chronic daily headache which appears to be occipital neuralgia with allodynia" and discussed "occipital nerve blocks to treat her symptoms." (R. 733).[12] On December 12, 2018, Dr. Jared Wilson, of Upstate Physical Medicine and Rehabilitation, noted that Plaintiff continued to complain of daily headaches. (R. 941). Thus, there is medical evidence in the record that may support Plaintiff's subjective headache complaints. Because the ALJ did not provide an explicit (or even implicit) explanation, the Court has no basis on which to evaluate whether the ALJ had legitimate reasons for rejecting Plaintiff's testimony regarding the severity and frequency of her headaches.

---

[12]None of these records appear to have been cited in the ALJ's decision.

Having found that the ALJ (1) made factual errors regarding Plaintiff's fibromyalgia diagnosis, (2) appears to have substituted her own view of the evidence with respect to Plaintiff's ability to focus, attend, and engage in medical appointments and failed to reconcile the evidence favorable to Plaintiff on these issues, and (3) failed to discuss Plaintiff's allegations of disabling headaches, the Court concludes that the ALJ's consideration of Plaintiff's subjective complaints is not supported by substantial evidence. The Court further concludes that viewed collectively these errors are not harmless. These errors implicate the ALJ's consideration of Plaintiff's subjective complaints of medical and mental impairments and prohibit the Court from engaging in a meaningful review of the ALJ's RFC determination. *See Aldridge v. Colvin*, No. 14-cv-06635, 2015 WL 6738757, at *6, 2015 U.S. Dist. LEXIS 149873, at *16 (W.D.N.Y. Nov. 4, 2015) (remanding where the "the ALJ did not detail the basis for his credibility assessment with respect to Plaintiff's alleged symptoms," explaining that it "it is impossible for the Court to conduct a meaningful review of her findings at Step Four to determine whether they are supported by substantial evidence" (quoting *Alcantara v. Astrue*, 667 F. Supp. 2d 262, 278 (S.D.N.Y. 2009))). Indeed, if the Commissioner were to determine, for example, that the record corroborated Plaintiff's subjective symptoms and that those symptoms would cause Plaintiff to be absent from work more than one day each month, a finding of not disabled would be precluded based on the vocational expert's testimony that such an individual could not perform any work. (R. 54–55).

### B.    RFC Determination and Evaluation of Medical Opinions

Having found remand is required, the Court does not reach the merits of Plaintiff's arguments concerning the ALJ's RFC determination or weighing of the medical opinion evidence. (Dkt. No. 13, at 17–25). However, the Court notes that the ALJ found that the three opinions in the record regarding Plaintiff's physical limitations were "not persuasive," (*see* R.

20–21 (finding opinions by Dr. Lorensen, a consultative examiner, the reviewing state agency physician, and PT Canavan were "not persuasive")), and that there is no medical opinion in the record that corresponds to the ALJ's RFC finding. In short, the ALJ found Plaintiff had greater limitations than those Dr. Lorensen and the state agency physician found but fewer limitations than those PT Canavan found. (*Id.*). Although the Commissioner maintains that this was not improper because "the RFC was more restrictive, and thus, more favorable to Plaintiff," (Dkt. No. 16, at 23–24 (citing *Tammy Lynn B. v. Comm'r of Soc. Sec.*, 382 F. Supp. 3d 184, 195 (N.D.N.Y. 2019))), the Court notes that the RFC was *less* restrictive than PT Canavan's opinion, (*compare* R. 17, *with* R. 768–70). In any event, because remand for evaluation of Plaintiff's subjective complaints is required, the Commissioner is directed to reconsider the medical opinion evidence of record, "supplemented by further fact-gathering as needed." *Taylor v. Barnhart*, 117 F. App'x 139, 141 (2d Cir. 2004).

Accordingly, the Court reverses the Commissioner's decision and remands this action for further proceedings.

## V.    CONCLUSION

For these reasons, it is hereby

**ORDERED** that the decision of the Commissioner is **REVERSED**; and this action is **REMANDED** to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this Decision and Order; and it is further

**ORDERED** that the Clerk of the Court is directed to close this case.

**IT IS SO ORDERED.**

Dated: <u>March 24, 2022</u>

Brenda K. Sannes
U.S. District Judge

24